**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-333 |
| | § | |
| UNITED TRANSPORTATION UNION, | § | |
| | § | |
| Defendant. | § | |

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs BNSF Railway Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company ("the Railroads") bring this action against Defendant United Transportation Union ("UTU") seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201–02, and requesting injunctive relief requiring UTU to provide notice at least seventy-two hours prior to engaging in a strike or other self-help during the current round of national bargaining. The Railroads also request that UTU prevent and discourage self-help without at least a seventy-two hour notice to the Railroads. The Railroads filed their Motion for Summary Judgment, to which UTU timely responded. The Railroads then filed a Reply in Support of Plaintiffs' Motion for Summary Judgment. UTU likewise filed a Motion for Summary Judgment, to which the Railroads timely responded. UTU then filed a Reply to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment. For the reasons stated below, the Railroads' Motion for Summary Judgment is respectfully **DENIED**, and UTU's Motion

1

for Summary Judgment is **GRANTED.**

## I.  Background

The Railroads are participants in the National Carriers' Conference Committee (NCCC), which represents the Railroads, as a multi-employer group, in their bargaining with UTU.  This process is known as "national handling."  UTU is the collective bargaining representative for certain railroad employees engaged in the operation of trains, including conductors and brakemen.  Currently, NCCC is engaged in negotiations with UTU regarding proposed changes to the Parties' Collective Bargaining Agreements (CBAs).

*A.  The Strife over the Proposed Changes to the CBAs*

On November 4, 2004, the Railroads and UTU served notices to each other proposing changes to their existing CBAs.  The service of such a notice is a requirement under § 6 of the Railway Labor Act and symbolizes the initiation of "major dispute" resolution procedures.  The parties met in February and March 2005 to confer about the proposed changes.  The Railroads have proposed to either alter existing crew size agreements or, in the alternative, reduce wages.  UTU concedes it is strongly opposed to this proposal.  UTU terminated the March bargaining session after a "heated exchange" between UTU's president and the Railroad's chief negotiator regarding the crew size and wage reduction proposal.  UTU filed a lawsuit the following day seeking to have the Railroads' proposal declared invalid. *See United Transp. Union v. Alton & S. Ry. Co.*, No. 05-190-GPM, 2006 WL 664181 (S.D. Ill. Mar. 10, 2006).

On April 25, 2005, the NCCC invoked mediation by the National Mediation Board pursuant to § 5 of the Railway Labor Act. *See* 45 U.S.C. § 155 (2000).  On May 9, 2005, UTU suggested to the National Mediation Board that mediation of the dispute was not appropriate until after the

litigation regarding the crew size and wage reduction proposal was resolved.  However, on May 16, 2005, the National Mediation Board determined that the pending litigation did not provide a sufficient basis to refrain from mediation of the dispute, and it assigned a mediator on May 25, 2005.  The case is currently before the National Mediation Board.

On March 10, 2006, the District Court for the Southern District of Illinois held that UTU was not required to bargain nationally over the crew size issue; however, the court found that the wage reduction proposal was "appropriately in national handling." *Alton & S. Ry. Co.*, No. 05-190-GPM, 2006 WL 664181 at *5.  The Railroads responded to the decision by requesting that UTU engage in "voluntary negotiations over crew size." (Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. 9.)  If UTU does not agree to the proposed crew size reductions, the Railroads propose a wage freeze for current UTU-represented employees and a wage reduction of 20% for employees hired subsequent to the date a CBA is signed.  Thus, despite the Illinois District Court's ruling that UTU does not have to engage in national bargaining over crew size, the Railroads have tied their crew size proposal to their wage reduction proposal in such a way that UTU likely will be unable to reach an agreement with the Railroads without "voluntarily" negotiating nationally over crew size.  These negotiations are the impetus of this action.

*B.  The April 2005 Strike*

While the dispute involving crew size and wage reductions was ongoing, UTU was also involved in a dispute with BNSF Railway Company ("BNSF") regarding an agreement between BNSF and a different union, the Brotherhood of Locomotive Engineers ("BLET").[1]  UTU objected

---

[1]The other carriers that are parties to the instant dispute were not parties to the BLET-BNSF Agreement.

to the BLET-BNSF Agreement because UTU contended that the Agreement affected when and in what seniority its conductors would be promoted to engineers.  UTU took the position that the BLET-BNSF Agreement changed the status quo regarding CBAs between BNSF and UTU and that BNSF and BLET, in entering into the Agreement, instigated a major dispute.

On April 27, 2005,[2] after a dual-seniority ground service employee at Grand Forks, Minnesota was assigned to an engineer's job under the BLET-BNSF Agreement while another dual-seniority ground service employee with greater engineer seniority continued to work as a conductor,[3] UTU filed a lawsuit against BNSF and BLET, alleging that the Agreement violated the UTU-BNSF CBAs.  Two hours later, UTU struck BNSF.  Rather than striking only at Grand Forks, UTU struck all over the former Burlington Northern portion of BNSF, from the Pacific to Pensacola.[4]  UTU did not warn BNSF that it was going to strike.

According to UTU, the Minnesota District Court ordered it back to work within two hours of the initiation of the strike.  Eventually, the Minnesota District Court held that the dispute over the BLET-BNSF Agreement was a minor dispute and referred the matter to the National Railroad

---

[2]The Railroads find it significant that UTU commenced the strike two days after the Railroads invoked mediation over the crew size and wage reduction proposal negotiations.  UTU could not lawfully strike over the proposal because, under the Railway Labor Act, it is unlawful to strike over a major dispute until the dispute resolution procedures outlined in the Act are exhausted.  *See Consol. Rail Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. 299, 303, 109 S. Ct. 2477, 2480, 105 L. Ed. 2d 250 (1984).

[3]A "dual-seniority" ground service employee is one who holds seniority as both a ground service employee and a locomotive engineer. (Pl.'s Mem. Supp. of Mot. Summ. J. 9 n.9.)  The BLET-BNSF Agreement required "a ground service employee with junior engineer seniority in certain circumstances to take an engineer's job when the job would otherwise go vacant because no senior employee had bid the job." (Pl.'s Mem. Supp. of Mot. Summ. J. 9.)

[4]The former Burlington Northern Railroad merged with the former Atchison, Topeka, & Santa Fe Railway in 1995 to form what is now BNSF.

Adjustment Board for mandatory arbitration. The court ordered the parties to maintain the status quo until the arbitration process was complete, but it determined that it was unnecessary to issue a strike injunction since striking over a minor dispute is illegal under the Railway Labor Act. *See United Transp. Union v. BNSF Ry. Co.*, N. 05-cv-836 (S.D. Minn. May 16, 2005).

UTU did not request arbitration of the dispute over the BLET-BNSF Agreement until nine months after the Minnesota District Court declared the dispute to be minor. UTU claims that it did not fervently pursue arbitration because it was engaged in negotiations with BLET in an attempt to reconcile their differences, and the two unions have since agreed to cooperate regarding the BLET-BNSF Agreement issue. Conversely, the Railroads imply that UTU did not pursue the matter because the stated reasons for the April 2005 were merely pretext and, in reality, UTU struck over the crew size and wage reduction proposal, which is the subject of the instant dispute.

## II. Legal Standards

*A. Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). The court must view all evidence in the light most favorable

5

to the non-movant.  *See, e.g., Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252, 106 S. Ct. 2512.  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  *See id.* at 255, 106 S. Ct. at 2513.

## B.  Declaratory Judgment Standard

A  party may bring an action in federal court for a declaratory judgment regarding the "rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201. However, the court has considerable discretion in deciding whether to issue a declaratory judgment. *See Wilton v. Seven Falls* Co., 515 U.S. 277, 286, 115 S. Ct. 2137, 2142, 132 L. Ed. 2d 214 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."); *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 389 (5th Cir. 2003) (quoting *Wilton*, 515 U.S. at 287, 115 S. Ct. at 2143) ("The Declaratory Judgment Act 'is an enabling act, which confers discretion on the courts rather than an absolute right on a litigant.'").  A federal court may not issue a declaratory judgment unless an actual controversy exists. *See Middle S. Energy, Inc. v. New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).  The plaintiff must allege facts showing that "there is a substantial likelihood that he will suffer injury in the future" in order to meet the controversy requirement. *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).  Furthermore, the controversy must be ongoing, and it

may not be merely "conjectural, hypothetical, or contingent." *Id.*

C.  *Standard for Injunction to Give Notice of a Strike*

Congress passed the Railway Labor Act "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S. Ct. 2239, 2243, 129 L. Ed. 2d 203 (1994); *see also Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Employees*, 286 F.3d 803, 805 (5th Cir. 2002), *cert. denied*, 537 U.S. 1172, 123 S. Ct. 999, 154 L. Ed. 2d 914 (2003) ("It is well established that 'the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes.'" (quoting *Tex. & N. O. R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565, 50 S. Ct. 427, 432, 74 L. Ed. 1034 (1930))).  The legislation was the result of negotiations between operating brotherhoods and the rail carriers. *See Burlington N. R.R. v. Bhd. of Maint. of Way Employees*, 481 U.S. 429, 447 n.13, 107 S. Ct. 1841, 1852 n.13, 95 L. Ed. 381 (1987).  The Railway Labor Act outlines a dispute resolution process, which varies depending on the type of dispute. *See generally* Railway Labor Act, 45 U.S.C. §§ 151–188.

1.  *Major versus Minor Disputes*

There are two types of disputes under the Railway Labor Act: "major" and "minor." *See Consol. Rail Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 2480, 105 L. Ed. 2d 250 (1984) (explaining the origins of the terms "major dispute" and "minor dispute" and articulating the standard for determining if a dispute is major or minor). Major disputes generally involve disputes over CBAs or the lack thereof, and are predicated on § 2 Fifth and § 6 of the Railway Labor Act. *See* 45 U.S.C. §§ 152 Fifth & 156; *Consol. Rail Corp.*, 491 U.S. at 302, 109 S. Ct. at 2480.  Under §2 Fifth, carriers may only "change the rates of pay, rules, or working conditions of its

7

employees, as a class" under the terms of the CBAs or under the terms outlined in § 6 of the Railway

Labor Act. 45 U.S.C. §§ 152 Fifth, 156.

Minor disputes, on the other hand, involve the interpretation or enforcement of CBAs, and are

predicated on § 2 Sixth and § 3 of the Railway Labor Act. *See* 45 U.S.C. §§ 152 Sixth, 153; *Consol.*

*Rail Corp.*, 491 U.S. at 303, 109 S. Ct. at 2480.  Section 3 First and § 2 Sixth set out conference and

mandatory arbitration procedures for disputes "arising out of grievances or out of the interpretation

or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 152

Sixth (setting forth the timeframe for minor dispute conferences); *see also* § 153 First (establishing

the policies and procedures to be followed by the National Railroad Adjustment Board).

*2. Strike Injunctions*

If the dispute is major, a federal court may "enjoin a violation of the status quo pending

completion of the required procedures, without the customary showing of irreparable injury." *Consol.*

*Rail Corp.*, 491 U.S. at 303, 109 S. Ct. at 2480.  However, once the dispute resolution process

required under the Railway Labor Act is exhausted, which includes a lengthy bargaining process and

mediation, the parties are free to resort to self-help. *See id.* at 302–03; *see also* Norris-LaGuardia Act,

29 U.S.C. §§ 101–115 (prohibiting injunctions in labor disputes); *Order of R.R. Telegraphers v. Chi.*

*& N.W. R. Co.*, 362 U.S. 330, 342, 80 S. Ct. 761, 767–68, 4 L. Ed. 2d 774 (1960) (holding that major

disputes are covered by the Norris-LaGuardia Act's anti-injunction provisions).  Conversely, the

Railway Labor Act "prohibits all strikes over minor disputes." *Ry. Exp. Agency, Inc. v. Bhd. of Ry.,*

*Airline & S.S. Clerks*, 437 F.2d 388, 392 (5th Cir. 1971).  Therefore, federal courts are empowered

to issue strike injunctions to "compel compliance with the provisions of the [Railway Labor] Act."

*Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 39–42, 77 S. Ct. 635, 640–41, 1

L. Ed. 2d 622 (1957).  The Norris-LaGuardia Act, which restricts a court's right to issue injunctions growing out of labor disputes, does not prohibit courts from enjoining strikes over minor disputes. *See id.*  However, such an injunction must be "'specific in its terms [and] shall describe in reasonable detail . . . act or acts sought to be restrained.'" *Bhd. Maint. Way*, 286 F.3d at 809 (alterations in original) (quoting *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236, 1245–46 (5th Cir. 1975)).

### 3.  Violations of § 2 First

In *Burlington Northern & Santa Fe Railway Co. v. Brotherhood of Maintenance of Way Employees*,  the Fifth Circuit addressed whether, under the Railway Labor Act, a district court could issue an injunction requiring a union to give notice to the carrier before engaging in a strike, work stoppage, picketing, or other self help. 285 F.3d 803.  The Fifth Circuit determined that repeatedly engaging in unlawful strikes was a violation of § 2 First of the Railway Labor Act, which requires labor and management to "exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce . . . ." 45 U.S.C. § 152 First; *Bhd. Maint. Way*, 285 F.3d at 809.  Under *Brotherhood of Railroad Trainmen*, a court may issue a strike injunction to compel compliance with the Railway Labor Act. *Bhd. R.R. Trainmen*, 353 U.S. at 359–62.  In order to "thwart" violations of § 2 First, the Fifth Circuit found that a district court may "carefully tailor[] a remedy designed to take care of th[e] specific factual situation" whereby a union has "a pattern, practice, and policy of authorizing, encouraging, permitting, calling or engaging in strikes, work stoppages, picketing, and other self-help against plaintiffs." *Bhd. Maint. Way*, 285 F.3d at 805, 809.

The Fifth Circuit did not reach the question whether § 2 First of the Railway Labor Act forbids "*all* surprise strikes." *Bhd. Maint. Way*, 285 F.3d at 807.  The District of Columbia Circuit, on the

other hand, opines that "the continuing duty of responsible bargaining under the [Railway Labor] Act fairly embraces reasonable notice of a strike or lockout or other self help." *Del. & Hudson Ry. v. United Transp. Union*, 450 F.2d 603, 622 (D.C. Cir. 1971), *cert. denied* 403 U.S. 911, 91 S. Ct. 2209, 29 L. Ed. 2d 689 (1971).[5]   However, subsequent to the District of Columbia's *Delaware & Hudson Railway* opinion, the Supreme Court expressed its concern regarding strike injunctions in *Chicago & Northwest Railway v. United Transp. Union*: "[A] party seeking to maintain the status quo may be less willing to compromise during the determinate processes of the Railway Labor Act if he believes that there is a chance of indefinitely postponing the other party's resort to self-help." Therefore, the Supreme Court restricted the issuance of strike injunctions for § 2 First violations to situations in which "such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort." *Chi. & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 583, 91 S. Ct. 1731, 1738, 29 L. Ed. 2d 187 (1971).

In *Brotherhood of Maintenance of Way*, the Fifth Circuit upheld an injunction requiring the union to give a notice of ten days before engaging in a strike. *See Bhd. Maint. Way*, 286 F.3d at 804, 809.  The court's consideration of the numerous times the union had gone on strike illegally and the fact that the union had recently increased its practice of engaging in surprise strikes led to its finding that a notice injunction was appropriate, which is squarely in-line with the Supreme Court's "only practical, effective means" injunction standard. *See Bhd. Maint. Way*, 286 F.3d at 805.  So, it follows that the standard for a notice injunction when there is an allegation of a § 2 First violation involves

---

[5]It bears noting that the District of Columbia Circuit was concerned with "such actions as a deliberate timing of a strike without prior warning, with the purpose of enhancing plant damage, or some other garrotte of jungle warfare." *Del. & Hudson Ry.*, 450 F.2d at 622.  The Court notes that failing to give notice of a strike does not always amount to "jungle warfare."

(1) determining whether the union has violated § 2 First by weighing the evidence, and (2) determining whether issuing an injunction is the "only practical, effective means" of ensuring the union does not continue to violate § 2 First.

### III. Analysis

The Railroads contend that UTU violated § 2 First of the Railway Labor Act and that a notice injunction and declaratory judgment are needed in order to avoid an unnecessary interruption of interstate commerce.  UTU first contends that it did not violate § 2 First and that a notice injunction is therefore unwarranted.  However, UTU has offered two alternative contentions in case the Court finds the claim against UTU is valid.  Because the § 2 First analysis comprises the meat of this Order, the Court will first address UTU's alternative contentions.

*A.  Compulsory Counterclaim*

UTU contends that the instant claim must be dismissed because it should have been presented as a compulsory counterclaim in the Minnesota District Court that determined that the BLET-BNSF Agreement issue was a minor dispute.  A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a).  The Fifth Circuit uses the "logical relationship" test to determine if a counterclaim is compulsory. *See Montgomery Elevator Co. v. Bldg. Eng'g Servs.*, 730 F.2d 377, 380 (5th Cir. 1984).  A claim and counterclaim have a logical relationship if "the counterclaim arises from the same 'aggregate of operative facts,'" or "the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Plant v. Blazer Financial Servs., Inc.*, 598 F.2d 1357, 1361 (5th Cir. 1979) (quoting *Revere Copper & Brass, Inc. v. Aetna Cas. & Sur. Co.*,

426 F.2d 709, 715 (5th Cir. 1970)).

The case before the Minnesota court involved a disagreement over the seniority provisions in BNSF's contract with BLET, which was the alleged reason for UTU's strike in April 2005. The Minnesota District Court determined that the disagreement was a minor dispute. *See United Transp. Union v. BNSF Ry. Co.*, N. 05-cv-836 (S.D. Minn. May 16, 2005). In the instant case, the Railroads present the April 2005 strike as evidence that UTU is not complying with its § 2 First duty regarding the negotiations over the Railroads' crew size and wage reduction proposal. The Railroads note that the NCCC and UTU were engaged in highly antagonistic negotiations over the proposal when UTU went on strike in April 2005. Two hours before the strike, a UTU official allegedly told BNSF's Chief Operating Officer that BNSF's "'insistence on running one-man crews was going to take BNSF's labor relations from the best in the country to the worst, and that 'you will soon feel the impacts of what I am talking about.'" (Pl.'s Mot. Summ. J. 12 n.12 (citing Dealy Dec. ¶ 7).)

UTU claims that the Railroads base the instant cause of action on the April 2005 strike, that the Railroads claim the strike occurred because of UTU's disgruntlement over the crew size and wage reduction proposal, and that, therefore, there is a logical relationship between the claims. Thus, according to UTU, the current request for a notice injunction should have been brought as a compulsory counterclaim in Minnesota. The Railroads counter that the April 2005 strike serves as *evidence* in the instant case, but that the subject matters of the two cases are quite different.

Regardless of the Railroads' contentions about the impetus of the April 2005 strike, a request for a notice injunction due to the antagonistic crew size and wage reduction negotiations does not arise out of the same transaction or occurrence as the dispute over the BLET-BNSF Agreement addressed by the Minnesota District Court. Simply using a strike that is the subject of previous

litigation as evidence in a later action does not amount to arising out of the same transaction, particularly given the fact that the Railroads present additional evidence in the instant case. Therefore, the Court holds that the Railroads were not required to bring the instant action as a counterclaim in the Minnesota District Court.

## B.  Standing

UTU's second alternative contention is that CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company do not have standing in this case.  UTU claims that the 2005 strike was only against BNSF and that the other carriers have not alleged "any personal injury fairly traceable to defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 3324, 82 L. Ed. 556 (1984).  However, the 2005 strike is not the only evidence the Railroads present in their request for declaratory relief and a notice injunction.  The Railroads allege that UTU has been hostile in its negotiations with the NCCC over the Proposal, and the NCCC represents all Plaintiffs in those negotiations.  Therefore, each Plaintiff has alleged a personal injury fairly traceable to UTU's alleged unlawful conduct.  Thus, the Court holds that each Plaintiff has standing.

## C.  Request for Notice Injunction

### 1. Bargaining Power

There have been numerous shifts in the labor climate in this country.  During the latter years of the Gilded Age, employees had almost no protection from their employers, and the robber barons

prevailed in their pursuit of endless treasure at the expense of their employees.[6]   The Ludlow

Massacre serves as an example of the devastation brought about by this state of affairs.[7]

In 1913, John D. Rockefeller, Jr., was completely unaware of the conditions under which the

coal miners who worked at Colorado Fuel and Iron Company, one of his many investments, lived.

*See* H.M. Gitelman, *Legacy of the Ludlow Massacre: A Chapter in American Industrial Relations* 16

(1988).  The coal mine managers, Jesse Welborn and John Osgood, were more concerned with finding

ways to remedy the "'unsatisfactory financial returns'" over which Rockefeller complained than with

making sure the coal miners and their families had a decent place to live.  *See* David A. Wolff,

*Industrializing the Rockies: Growth, Competition, and Turmoil in the Coalfields of Colorado and*

*Wyoming, 1868-1914*, at 231 (2003).  They also saved money by ignoring state labor laws such as the

requirements of pay periods at least twice a month and workdays of no longer than eight-hours. *See*

*id.* at 232.  Many miners became agitated with their employers' seeming lack of care with regard to

--------------------------------------------------

[6]A contradiction exists in that while labor itself generally suffered as a result of the mass accumulation of wealth in the hands of a few that occurred during this era in American history, the robber barons are also known for their philanthropy. *See, e.g.*, Matthew Josephson, *The Robber Barons* 325 (1962) (discussing Rockefeller's "strange and wonderful" philanthropies, and stating that "[a]t times it was difficult to understand the guiding principle which fostered extensive missionary work in China at a moment when the workers of his Colorado Fuel & Iron Company were being shot down or burnt alive in industrial war"); *id.* at 363 (juxtaposing Carnegie's "philanthropy" in buying and renovating company housing in one area of Pittsburgh while "Painter's Row," also in Pittsburgh, was "left untouched–with its five hundred people living in . . . dark, overcrowded sleeping quarters, . . . and no sanitary accommodations worth the name").

[7]The Ludlow Massacre is used only as an example of the increasing violence between labor and employers occurring in the late Nineteenth and early Twentieth Centuries.  Either the state militia or federal troops intervened and took part in bloody battles on many occasions, including the Coeur d'Alene, Idaho miners strike in 1892, the Pullman Strike in 1894, the Cripple Creek, Colorado miners strike in 1903–04, and the Cabin Creek, West Virginia miners strike in 1912. *See generally* Joseph G. Raybeck, *A History of American Labor* (1966).

their welfare, and, despite Osgood's and Welborn's adamant anti-union stands, joined the union. *See id.* at 232–33.  In 1913, the United Mine Workers Association vice president attempted to meet with the Colorado companies and requested that the governor of Colorado call a conference.  The companies refused to meet.  On September 23, 1913, over 10,000 workers went on strike. *See id.* at 234.  The miners and their families set up tent colonies nears the mines because they could no longer live in company-owned houses. *See id.* at 235.

Violence between the striking miners and the company mine guards ensued almost immediately.  Both sides were armed.  In October 1913, at least three battles between miners and company mine guards took place near Ludlow; in one of the battles, at least two people died when a company-owned armored vehicle with attached machine guns fired upon a tent colony.  The Colorado governor mobilized the National Guard to help curb the violence.  Initially, this approach helped.   However, the striking miners soon grew suspicious of the National Guard.  There were reports that company guards were joining the militia, and reports that the coal companies were supplementing the militia's salaries. *See id.* at 236.

On April 20, 1914, after a tumultuous night of gunfire following the murder of a mine worker the previous day, one of the National Guard troops set up on a hill above Ludlow, where the militiamen could fire into the tent colony. The strikers ran for cover–away from the colony.  Shooting began, and by that evening the colony was on fire.[8]  After the battle, the citizens of Colorado were

---

[8]There is dispute regarding the militia's involvement in the spread of the fire.  Some historians report that the troops captured the camp and set it on fire. *See Raybeck*, *supra* at 258 (1966); *see also* Gitelman, *supra* at 18 (reporting that "the militia overran the colony, looted the tents, and, after dousing them with kerosene, put them to the torch").  Others report that, when the colony began to burn, the militiamen rushed to the scene to save the women and children. *See* Wolff, *supra* at 237 (noting the conflicting reports among historians).

appalled to learn that eleven children and two women, who were hiding in a cellar below a tent, suffocated when the tent above them was consumed by the fire. *See id.*; *see also* Joseph G. Raybeck, *A History of American Labor* 258 (1966) ("Attacks by company guards and state militia upon tent colonies at Holly Grove, Forbes, and Ludlow had horrified the nation.").

Eventually, the governor of Colorado requested help from the federal government, and President Woodrow Wilson sent in federal troops. The federal troops were successful in ending the violence, and the United Mine Workers Association ended the Colorado strike on December 10, 1914. This horrific episode in labor history cost over 200 lives. *See id.* at 238. Along with the loss of lives, the episode brought about a sea-change in labor-management relations in the coal-mining industry. *See* Raybeck, *supra* at 258 ("The public suddenly . . . gave its sympathy unstintingly to unionism. A larger portion of the public now became convinced . . . that a reform in industrial conditions was needed."). The number of coal miners in Colorado who were members of the United Mine Workers Association grew from merely 187 people in 1910 to over 5,000 members in 1917. *See* Wolff, *supra*, at 239; *see also* Raybeck, *supra* at 259 ("[T]he strikes" in West Virginia and Colorado, culminating with Ludlow, "added some 150,000 miners to the federation's membership rolls.").

As time moved on, the government came to the aid of the tireless worker. Modern employees are protected by numerous labor laws. *E.g.* Fair Labor & Standards Act of 1938, 29 U.S.C. §§ 201–219, National Labor Relations Act of 1935, 29 U.S.C. §§ 151–169; Railway Labor Act, 45 U.S.C. §§ 151–188 (passed May 20, 1926). These laws were passed, though, before globalization drastically impacted employment and labor trends throughout the world. The problems workers face have dramatically changed with our changing society, and the techniques companies use to maintain a satisfactory profit margin have necessarily changed, too. Many industries that historically relied on

union labor have ceased operating in the United States, and many of the new industries that have evolved are either not conducive to a unionized workforce or have found effective ways of remaining union-free.  As a result, unionization has decreased substantially in the past few decades, dropping from 36% in 1953 to 8.2% in 2004. *See* U.S. Census Bureau, Statistical Abstract of the United States, 2004-2005, at 419 (124th ed. 2004).  While unionization has grown substantially weaker due to globalization, it is not dead.  There are still viable industries within the U.S. economy in which employees rely on union representation, one of which is the Railroad industry.  This Court refuses to sound the death knell to railway unions by taking away their last bargaining chip: the right to legally strike over a major dispute.

### 2.  Is the Dispute Major or Minor?

The dispute regarding the Railroads' crew size and wage reduction proposal is clearly a major dispute because it involves a "change [in] the rates of pay, rules, or working conditions of [the Railroads'] employees, as a class."  45 U.S.C. § 152 First.  The parties have exchanged § 6 notices regarding their desires to change the status quo, they have conferred, and the Railroads have invoked the services of the National Mediation Board.  If the mediation fails, the Railway Labor Act directs the National Mediation Board to encourage the parties to agree to binding arbitration. *See* 45 U.S.C. § 5 First, 7; *see also Bhd. R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S. Ct. 1109, 1115, 22 L. Ed. 2d 344 (1969) (outlining the requirements with which parties engaged in a major dispute must comply under the Railway Labor Act before resorting to self-help).  The National Mediation Board may refer the matter to the President, who "may create an emergency board to investigate and report on the dispute." *Trainmen*, 394 U.S. at 378, 89 S. Ct. at 1115 (citing § 10 of the Railway Labor Act).  Neither party may alter the status quo "[w]hile the dispute is working its way

through these stages." *Id.* However, if the parties have not consented to arbitration and the President has not appointed an emergency board within thirty days after the National Mediation Board's recommendation, the parties are free to engage in self-help. *See* 45 U.S.C. § 155. If the President does appoint an emergency board, the parties must wait until thirty days after the emergency board's recommendation to the President before engaging in self-help. *See* 45 U.S.C. § 160.

According to the briefing received by this Court regarding the instant dispute, the National Mediation Board has not issued its recommendation. If the mediation fails, the parties should seriously consider binding arbitration. However, consenting to binding arbitration is not required under the Railway Labor Act. Thus, as long as the parties are in compliance with § 2 First and the President has not created an emergency board to prevent an interruption in commerce, the parties are free to engage in self-help thirty days after the National Mediation Board's recommendation.

### 3. *Alleged Violation of § 2 First*

The Railroads base their request for a notice injunction on the Fifth Circuit's opinion in *Brotherhood of Maintenance of Way*. The Railroads allege that UTU has a policy of engaging in unlawful strikes, that the current acrimonious round of bargaining presents a threat of a strike, and that, therefore, they are entitled to a remedy designed specifically for their situation. The Railroads request that the Court issue a notice injunction similar to the injunction upheld by the Fifth Circuit in *Brotherhood of Maintenance of Way*. However, rather than asking for a ten-day notice injunction as BNSF did in *Brotherhood of Maintenance of Way*, the Railroads contend that requiring UTU to give the Railroads a seventy-two hour notice prior to engaging in strikes, picketing, work stoppages, or other self help is "narrowly tailored to the harm caused by UTU's admitted policy and practice of striking without notice." (Pl.'s Mot. Summ. J. 2.)

     *a. Alleged Policy of Striking Without Notice.*   UTU contends that, while it does have a "policy" of striking without notice,[9] it has not engaged in a pattern of unlawful strikes rising to the level necessary to require a notice injunction because their alleged policy and practice of striking without notice does not meet the "high standard" set by the Supreme Court to sustain a § 2 First violation.   UTU claims that it has only engaged in self help when it "felt it had the right to do so pursuant to the Railway Labor Act." (Def.'s Mem. in Supp. of Mot. for Summ. J. 7.)   In fact, UTU claims that, other than the strike over the BLET-BNSF Agreement, it has not engaged in a strike against BNSF since BNSF's formation in 1995.   UTU notes that it engaged in one strike against BNSF's predecessor, Burlington Northern Railroad, on October 31, 1987, and that the court found it could not issue an injunction against the strike. *See Burlington N. R.R. v. United Transp. Union*, 848 F.2d 856 (8th Cir. 1988).   UTU also engaged in one strike against BNSF's other predecessor, ATSF, in 1986.   UTU and ATSF reached an agreement, so no litigation ensued.   In addition, UTU engaged in two strikes against two other Plaintiffs, Kansas City Southern Railway Company in 1997 and Union Pacific Railroad Company in 1994.   The only strike in which a strike injunction was issued, according to UTU, was the Kansas City Southern Railway Company strike.   Hence, according

---

     [9]UTU's International President, Paul C. Thompson, stated in his deposition testimony that UTU has a "policy and practice" of striking without notice. (Thompson Dep. 9–10.)  However, he also stated that UTU only strikes when it believes the dispute is major and states, "By the time I've authorized a strike, the carrier should know very well that there's probably one coming." (Thompson Dep. 10.)  UTU's Assistant President, Richard L. Marceau, also testified that UTU has a "policy and practice" of engaging in strikes without giving notice. (Marceau Dep. 22–23.) Marceau explains further:

> In my opinion, if you're going to strike and if you notify the carrier, they're going to have people in place to move the trains or there are going to be all types of contingencies.  I don't know why you would ever notify anybody that you're going to strike.  I've never heard of it being done.

*Id.*

to UTU, it has engaged in five surprise strikes[10] against the five Plaintiffs in this action over the past twenty years, and two of those strikes have been declared by courts to be illegal. UTU claims these limited incidences of unlawful strike activity do not rise to the level required for the issuance of a notice injunction.

      *b.   Alleged Threat of Striking During the Current Round of National Bargaining.*   The Railroads contend that UTU's past strike activity combined with its actions during the current round of bargaining constitute a violation of § 2 First and warrant a notice injunction under *Brotherhood of Maintenance of Way.*   The Railroads cite the "aggressive rhetoric" UTU has used in opposition to the crew size and wage reduction proposal as evidence that there is a continuing threat that UTU will strike during the current round of national bargaining. (Pl.'s Mot. Opposing Def.'s Mot. Summ. J. 7.) In order to find that the rhetoric is a violation of § 2 First , the Court must determine, after evaluating the "totality of the circumstances," that UTU was merely "go[ing] through the motions with a 'desire not to reach an agreement.'" *Chi. & N.W. Ry.*, 402 U.S. at 578, 91 S. Ct. at 1736 (quoting *N.L.R.B. v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir. 1953)).

      The Railroads argue that UTU's actions during this round of bargaining are evidence that it is not making "every reasonable effort" to reach an agreement.  First, UTU walked out of the second bargaining session.  Immediately thereafter, UTU filed a previously prepared lawsuit against the Railroads requesting an Illinois District Court to determine whether the Railroads' crew size and wage reduction proposal should be bargained for nationally or locally.  During the pendency of the Illinois case, UTU publicized its malcontent with the Railroads over the issue.  A UTU website posting,

---

[10]UTU has actually engaged in six strikes over the past twenty years, but it gave notice in one of the strikes. (Thompson Dep. 9–10.)

citing Mark Twain's analogy of learning a lesson when one picks up a cat by its tail, declared that the

"the lesson . . . must now be scratched into the carriers' faces . . . ." (Carriers' Ex. 7.)  The Railroads

next cite several other instances in which UTU criticized the crew size and wage reduction proposal

and indicated it would "'be proactive and go to the limit to protect [its] crew size agreements."[11] (Pl.'s

Mot. Summ. J. 26–27.)  Soon after this allegedly threatening propaganda, UTU went on strike,

allegedly over the BLET-BSNF Agreement.

While the Court agrees that UTU has strongly advocated for its members during this round

of bargaining and that such advocacy has at times been hostile, the Railway Labor Act does not forbid

strong advocacy so long as the parties are still attempting to ameliorate their differences. *See Indep.*

*Union of Flight Attendants v. Pan Am World Airways*, 624 F. Supp. 64, 66 n.1 (E.D.N.Y. 1985)

(noting that engaging in "robust, bare-knuckled bargaining" does not, in and of itself, constitute

bargaining in bad faith).  The evidence offered by the Railroads in support of their contention that

UTU is not complying with its § 2 First duty does not indicate that UTU was merely going through

the motions.  Conversely, the fact that UTU filed the Illinois lawsuit indicates that it was working to

resolve the dispute by asking a federal court to make a determination as to whether it had to bargain

nationally over the crew size and wage reduction proposal.  The Court finds through its analysis of

---

[11]Interestingly, BNSF cited similar rhetoric used by Brotherhood of Maintenance of Way in *Brotherhood of Maintenance of Way*.  In the dissent, Judge Duplantier astutely reasoned:

> The district court . . . relied in part upon the union's stated policy that it "will do what it has to do" to protect its members.  That policy is simply a statement that the union will do its duty toward its members; it does not support a conclusion that the union planned to engage in unlawful activity in the future.

*See Bhd. Maint. Way*, 286 F.3d at 813 (Duplantier, J., dissenting).

the totality of the circumstances that the strong advocacy UTU has engaged in thus far during this dispute combined with UTU's strike history does not amount to a violation of § 2 First.

    *c. The Second Prong of the Notice Injunction Test.*  Because the Court holds that UTU has not violated § 2 First, it is unnecessary for the Court to reach the second prong of the inquiry—determining whether a notice injunction is the only practical, effective means of ensuring UTU does not continue to violate § 2 First.  However, if the Court were to determine that UTU's 2005 strike combined with acrimonious negotiations and the propaganda used in this dispute amounted to a violation, it still would not issue a notice injunction.  UTU states that it does not strike over minor disputes because it is illegal.  The Railroads acknowledge that unions and carriers often disagree as to whether a dispute is major or minor.  UTU insists that it believed the strike in 2005 was a major dispute, and the Railroads' contention that UTU did not officially strike over the crew size and wage reduction proposal because it knew such a strike was illegal gives rise to a heavy inference that the Railroads agree that UTU does not generally strike when it is aware that the strike would be unlawful. This Order serves as a clarification to UTU, should it need one, that it is unlawful for it to strike over the crew size and wage reduction proposal until it has completed the requirements for a major dispute set forth in the Railway Labor Act.  Because UTU is aware the current dispute is a major dispute and UTU does not have a history of striking over disputes that it knows are major disputes before the Railway Labor Act's dispute resolution procedures are complete, this Order is a practical means of ensuring that UTU will not resort to self-help before it is lawful.  Thus, a notice injunction is not the only practical, effective means of ensuring that an alleged § 2 violation does not continue.

*D. Request for Declaratory Judgment*

    The Railroads ask the Court to issue a declaratory judgment declaring that UTU's policy of

striking without notice is unlawful under § 2 First of the Railway Labor Act. The Railroads, in fact, assert that all surprise strikes are unlawful under § 2 First. First, the Railroads have failed to convince the Court that UTU has the type of *ongoing* policy of surprise strikes that is a § 2 First violation under *Brotherhood of Maintenance of Way*, as discussed above. Second, neither the Railway Labor Act nor binding case law explicitly require notice of a strike as a prerequisite to fulfilling one's § 2 First duty to "exert every reasonable effort" to resolve major disputes before resorting to self-help.

   *1. Case Law*

   The only binding case law the Railroads cite in support of their assertion that striking without notice is illegal per se under § 2 First of the Railway Labor Act is *Brotherhood of Maintenance of Way*. However, the Fifth Circuit confined its holding in *Brotherhood of Maintenance of Way* to the facts of the case, leaving open the question of "whether the [Railway Labor Act] forbids *all* surprise strikes." *Bhd. Maint. Way*, 286 F.3d at 807. In *Brotherhood of Maintenance of Way*, the union had engaged in eighteen strikes, attempted strikes, or strike threats against BNSF over the past nine years, and four of these incidents occurred in the year preceding the injunction. *See id.* at 805. At least seven of the union's surprise strikes were held to be illegal. *See id.* at 806 (citing *Burlington N. & Santa Fe Ry. v. Bhd. of Maint. of Way Employees*, 143 F. Supp. 2d 672, 680–85 (N.D. Tex. 2001), *aff'd* 286 F.3d 803 (chronicling seven cases in which the union illegally went on strike over minor disputes)). The Fifth Circuit determined that a notice injunction was the only effective means to enforce the § 2 First duty because of the union's history of "ongoing, repeated . . . surprise strikes that are doomed to be held illegal and enjoined." *Id.* at 807–08. In the instant case, rather than four incidents in the year proceeding the notice injunction request, UTU has engaged in one surprise strike in recent history. Additionally, rather than the *eighteen* incidents against *one* carrier engaged in by

Brotherhood of Maintenance of Way over the past *nine* years, UTU has engaged in *five* surprise strikes against *five* carriers in the past *twenty* years.  The facts of the instant case are clearly not as egregious as those in *Brotherhood of Maintenance of Way*.  Therefore, *Brotherhood of Maintenance of Way* does not bind this Court to issue a notice injunction based on the facts with which it has been presented.

The Railroads cite two additional cases in support of their assertion that surprise strikes are unlawful.  First, they cite the District of Columbia Circuit, which states that "the continuing duty of responsible bargaining under the [Railway Labor] Act fairly embraces reasonable notice of a strike or lockout or other self help." *Del. & Hudson Ry.*, 450 F.2d at 622.  The Court agrees that reasonable notice of a strike could be an element of responsible bargaining, but whether such notice has been given should not be determinative as to whether the union has violated § 2 First.  The duty to "exert every reasonable effort" under § 2 First can be complied with in myriad ways, all dependent on the particular dynamics of the parties and their dispute.  Furthermore, one should not lose sight of the fact that the statute requires every *reasonable* effort, and, in some situations, it may not be reasonable to require a union to give notice before striking.  For instance, if the statute were in effect during the early Twentieth Century when the drama at Ludlow unfolded, it would not have been reasonable for the miners to give their employers notice when their employers were failing to comply with the labor laws themselves and refusing to even meet with the union.

The second non-binding case the Railroads cite for their assertion that all surprise strikes are unlawful under § 2 First is a fairly recent Eleventh Circuit case, *Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 238 F.3d 1300 (11th Cir. 2001).  In *Delta*, Delta Airlines pilots were refusing overtime and special work assignments, and statistics substantiated that the concerted effort of the pilots to not

work overtime caused harm to Delta and the flying public.  Delta "lost millions of dollars in revenues, rerouting expenses, extra operating costs, and overnight hotel and meal vouchers.  Additionally, Delta . . . suffered loss in the form of good will and traffic that is immeasurable." *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 123 F. Supp. 2d 1356, 1358 (N.D. Ga. 2000), *rev'd*, 238 F.3d 1300.  The Air Line Pilots Association was not ordering the concerted activity, and had, in fact, counseled against the concerted effort of the pilots. *See id.*   The Eleventh Circuit held that the Air Line Pilots Association was not in compliance with § 2 First's requirement to make "every reasonable effort to make and maintain agreements." 45 U.S.C. § 152 First; *Delta Air Lines*, 238 F.3d at 1309 (quoting § 152 First).  The Eleventh Circuit stressed that the  Air Line Pilots Association must "do everything possible to 'maintain' the CBA so that commerce is not in any way interrupted." *Delta Air Lines*, 238 at 1309.  The Eleventh Circuit then ordered the district court to enjoin the Air Line Pilots Association "to take specific steps aimed at stopping the pilots' no-overtime campaign." *Id.*

*Delta Air Lines* did not involve surprise strikes at all.  Instead, it involved a union that was not sufficiently keeping its membership in check and thus causing dramatic interruptions to commerce, in defiance of the Railway Labor Act's requirement to use every reasonable effort to prevent such interruptions.  The Railroads do not present the Court with any evidence that UTU's actions during the instant dispute are in any way a continuous threat to commerce.  Instead, the Railroads fear a single strike that, while admittedly economically damaging to the Railroads, is not an ongoing injury like the injury Delta Air Lines was suffering due to the unauthorized concerted effort of its pilots.  Therefore, the Court finds that *Delta Air Lines* is not in accord with the case at hand.

  2.  *The Danger of a Blanket Declaration*

25

The Railway Labor Act allows the parties to engage in self-help during a major dispute if the processes of negotiation and mediation established by the Railway Labor Act have failed. *See Consol. Rail Corp.*, 491 U.S. at 311, 109 S. Ct. at 2484; *see also Burlington N. R.R.*, 481 U.S. at 445, 107 S. Ct. at 1851 ("[I]f the parties exhaust these procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute, subject only to such restrictions as may follow from the invocation of an Emergency Board under § 10 of the [Railway Labor Act]").  As discussed above, the current dispute is a major dispute, and UTU and the Railroads have been attempting to comply with § 2 First by engaging in negotiation and mediation.  If these processes ultimately fail, there is nothing in the law that prevents the union from going on strike.  If one were to read a requirement to give notice of the strike into the law, then the carrier may be successful in getting an injunction prohibiting the strike before the strike could occur, or the carrier could have alternate employees in place before the strike occurs.  Thus, the threat of a strike would be rendered meaningless. *Cf. Trainmen*, 394 U.S. at 381, 89 S. Ct. at 1117 ("The Railway Labor Act's entire scheme for the resolution of major disputes would become meaningless if [courts] could prohibit the parties from engaging in any self-help.").  This result is contrary to the policy espoused by Congress when it passed this protective legislation.  *See Bhd. Ry. & S.S. Clerks*, 384 U.S. at 244, 86 S. Ct. at 1423 ("[T]he strike has been the ultimate sanction of the union, [because] compulsory arbitration [has] not be[en] provided [by Congress]."); *Fla. E. Coast Ry. Co. v. Bhd. of R.R. Trainmen*, 336 F.2d 172, 181 (1964) ("[W]hen the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each [party].  On the side of labor, it is the cherished right to strike.").  As the Supreme Court astutely warned in *Chicago & Northwest Railway Co.*, the ability of courts to issue strike injunctions

> creates a not insignificant danger that parties will structure their negotiating positions and tactics with an eye on the courts, rather than restricting their attention to the business at hand.  Moreover, the party seeking to maintain the status quo may be less willing to compromise during the determinate processes of the Railway Labor Act if he believes that there is a chance of indefinitely postponing the other party's resort to self-help after those procedures have been exhausted.

*Chi. & N.W. Ry.*, 402 U.S. at 583, 91 S. Ct. at 1738.  Declaring that surprise strikes were unlawful per se would essentially have the same effect. *Cf. Bhd. Maint. Way*, 281 F.3d at 811 (Duplantier, J., dissenting) ("The advance notice requirement imposed [in *Brotherhood of Maintenance of Way*] forever shifts the balance embodied in the RLA . . . ."). In the Ludlow Massacre, the employers asked the government by way of the National Guard to keep the union in line with bullets.  Here, the Railroads are asking the government to cripple unions with judicial opinions.  This Court will not be a party to such a macabre scene.

*E.  Separation of Powers*

Unlike *Brotherhood of Maintenance of Way*, the union in the instant case does not "have a long history of launching strikes without warning, including many that are illegal under the [Railway Labor Act]." *Id.* at 804. While the Fifth Circuit determined that a notice injunction was proper in the specific factual scenario presented in *Brotherhood of Maintenance of Way*, it did not hold that advance notice is required in all cases.   The Fifth Circuit merely required one union to give notice before striking and pointed out the numerous times the union had been derelict in its § 2 First duty.

Judge Duplantier dissented from the majority opinion, in part because he believed the case "represent[ed] in effect an attempt by the railroads to amend the [Railway Labor Act] through judicial interpretation rather than legislative amendment." *Bhd. Maint. Way*, 286 F.3d at 810 (Duplantier, J., dissenting).  He agreed that "[a] requirement of advance notice of intent to strike may well be sound policy," but argued that "the imposition of such a requirement is for Congress, not the court." *Id.* at

811. Interestingly, "in the 76 years since the [Railway Labor Act's] enactment no railroad has ever sought such an amendment from Congress." *Id.* at 810 n.1. Yet, the Railroads do not hesitate to ask this Court to read into the text a requirement to give notice before striking. While this Court follows the precedent set by the majority in *Brotherhood of Maintenance of Way*, it finds Judge Duplantier's reasoning in the dissent regarding the Separation of Powers to be particularly applicable to the facts of the instant case.

The Railroads argue that advance notice is required in all cases due to the interference even a short strike has on commerce. For example, the Railroads contend that "strikes disrupt the carriers' operations and interfere with nationwide transportation of coal, chemicals, grain, perishables, mail, packages, military material, and other freight." (Pl.'s Mot. Summ. J. 31.) The Railroads also complain that strikes cause (1) carriers to "incur substantial costs in responding to and recovering from the disruption in service;" (2) a short-term loss in business because shippers transfer cargo to other carriers; and (3) a long-term loss in business because customers are dissatisfied with their service. Finally, the Railroads note that there are necessarily "ripple effects" of a strike that "can have substantial secondary and tertiary costs across the nation." *Id.* Examples of the "ripple effect" are (1) manufacturers who are relying on an on-time delivery of parts have to wait; (2) perishable food can rot; and (3) individuals, supplies, and mail are all delayed.

While the Court sympathizes with the Railroads regarding the economic damage a strike may cause them, neither the text nor the case history of the Railway Labor Act requires notice for every strike. Parties are required to "exert every effort . . . in order to avoid any interruption to commerce," but such a requirement is not automatically infringed every time a union drives a hard bargain. 45 U.S.C. § 152 First. Issuing a notice injunction on the facts in the instant case would have the

28

effect of robbing the union of its bargaining power in every case in which there were strong disagreements between a union and a carrier.

The Court recognizes that if the Railroads do not have notice of a strike they are open to strikes over minor disputes or, if the dispute is major, strikes before § 2 First duties are fulfilled. The Court further recognizes that, in such situations, it takes time for a carrier to obtain an emergency injunction. The Parties to the instant action do not dispute that it took two hours to get an injunction in the April 2005 strike, and the Railroads claim that it can take up to eight hours to obtain an injunction if a union strategically times a strike so as to effectuate the most economic damage possible. Of course, if a union were to use such a strategy, it would likely be just as detrimental to the union as to the carrier, as a substantial economic loss to the Railroads would be just as harmful to the employees represented by UTU as it would be to the Railroads.

Beyond this logical reality, though, lies a very real concern that if the Court were to intercede in this situation in the interest of protecting commerce, it would be overstepping its bounds under the Constitution. It is the duty of Congress to write laws and the duty of the courts to enforce them. This Court does not find the economic damage the Railroads may encounter if UTU strikes to be paramount enough to justify judicially rewriting the Constitution or the Railway Labor Act. If the interruption to commerce is indeed significant, the Court recommends that the Railroads ask Congress to address the issue.

### IV. Conclusions

For the reasons stated above, the Railroads' Motion for Summary Judgment is **DENIED**. Accordingly, their requests for notice injunctions and request for a declaratory judgment are **DENIED**. UTU's Motion for Summary Judgment is **GRANTED**. However, the Court reminds UTU

that it is unlawful for it to strike during the current major dispute unless mediation by the National Mediation Board fails, the parties refuse to submit to binding arbitration, and the President does not appoint an emergency board.  If the President does appoint an emergency board, UTU may not strike until thirty days after the emergency board's recommendation to the President.  The Court further strongly encourages the parties to submit to binding arbitration if mediation should fail so as to avoid all the negative implications a strike could have on both the Railroads and UTU's members.  Each Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date.  A Final Judgement will be issued contemporaneously with this Order.

     **IT IS SO ORDERED**.

     **DONE** this 3rd day of November, 2006, at Galveston, Texas.

Samuel B. Kent
United States District Judge